UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>) Docket no. 2:23-CR-00034-GZS<br>ANGEL LUIS LOZANO, )<br>)<br>)<br>Defendant. ) | |

ORDER ON MOTION TO SUPPRESS

Before the Court is the Motion to Suppress (ECF No. 54) filed by Defendant Angel Luis Lozano. On September 18, 2023, the Court held an evidentiary hearing on the Motion. Following that hearing, both sides submitted supplemental filings (ECF Nos. 72 & 73). Having considered all of the submissions and admitted evidence, the Court now DENIES the Motion.

I.     FACTUAL FINDINGS

In May 2022, a task force of state and federal law enforcement was investigating the distribution of large amounts of methamphetamine in Maine when they received a tip that an individual named Mandy Shorey was participating in said distribution. (9/18/23 Tr. (ECF No. 71) (hereinafter, "Tr."), PageID # 201.) As part of their investigation, the FBI arranged for a series of undercover controlled buys from Shorey. (Id., PageID # 202.)

After conducting two smaller controlled buys in July 2022 and September 2022, the undercover officer arranged for the purchase of two pounds of methamphetamine from Shorey on November 10, 2022. (Def. Ex. 2, PageID # 4-5.) On that day, the undercover officer was equipped

1

with audio and video recording equipment as well as $14,000 in prerecorded buy currency. (Tr., PageID # 203.) The transaction was scheduled to occur in the evening at 125 Sherwood Street in Portland, Maine, which was a short term rental property.

Multiple officers were set up to conduct surveillance of this planned transaction. After watching both Shorey and the undercover officer separately arrive and enter 125 Sherman Street, the officers watched a white Chrysler arrive and park in front of the residence. (Def. Ex. 2, PageID #s 5-6; Tr., PageID # 203.) A male then emerged from the residence and interacted with this Chrysler. (Tr., PageID # 203.) After that, the male went back into 125 Sherman Street. Once he was inside the residence, Shorey delivered two packages to the undercover agent. (Id., PageID # 204.) These two packages were later tested and determined to be approximately two pounds of pure methamphetamine. (Id., PageID # 204 & 206-07; Gov't Exs. 2A & 2B.) Law enforcement surveilled the Chrysler as it left Sherman Street and observed it travelling southbound on the interstate. (Tr., PageID # 203.) They also subsequently determined that the white Chrysler was owned by a rental car company and, on the day of the transaction, had been rented from a location in Lawrence, Massachusetts, to an individual named Angel Lozano with a listed address in Lowell, Massachusetts. (Tr., PageID #s 204-06; Gov't Ex. 1.)

Utilizing an encrypted messaging application, agents then arranged for another controlled buy of two pounds of methamphetamine from Shorey. (Tr., PageID # 208.) This transaction was set for the night of January 26, 2023, at the same location, 125 Sherman Street (Id., PageID # 208.) All told, there were twenty law enforcement officers involved in surveilling this controlled buy with three to four officers set up to conduct surveillance on Sherman Street. (Id., PageID # 208; Def. Ex. 2.) Special Agent Grimes was conducting overall operations management from a vehicle located approximately half a mile away from 125 Sherman Street. (Tr., PageID #s 209 & 236.)

2

All of the surveilling officers, along with Agent Grimes, were in communication using an application called Zello, which allows for the recording of communications.[1] (Id., PageID # 216.)

The undercover agent was also outfitted with one-way audio recording equipment, which was monitored in real time. (Id., PageID # 209.) After parking his vehicle outside 125 Sherman Street just after midnight, the agent entered the residence with $16,000 in prerecorded currency, which was the agreed-upon price. (Id., PageID #s 208-09.) After the undercover agent entered 125 Sherman Street, two vehicles arrived at the same time. (Id., PageID # 210.) The first vehicle, a silver Honda SUV with a single driver, pulled directly in front of 125 Sherman Street. (Id., PageID # 210.) The second vehicle, a black Dodge Charger, then pulled past the residence, turned around, and parked within eyesight of the Honda with its lights off. (Id., PageID #s 210-11.) Both vehicles were registered in Massachusetts to owners located in Lawrence and Milton respectively. (Gov't Ex. 4B at 842.) The surveilling agents immediately expressed concern that the Dodge was conducting counter surveillance. (Id., PageID #s 211 & 222; Gov't Ex. 4B at 843.)

At that point, Shorey exited 125 Sherman Street and briefly got into the front passenger seat of the Honda. (Tr., PageID #s 212-13; Def. Ex. 2.) She then returned to the residence and reemerged minutes later carrying a backpack. (Tr., PageID # 213.) She then again interacted with the Honda and its driver. (Id.) After she returned to the residence, the Honda turned around and departed from 125 Sherman Street with the Dodge following in the same direction. (Id., PageID #s 213-14.) All told, the Honda and Dodge spent approximately ten minutes stopped on Sherman Street. (Gov't Ex. 4B, at 842-43.) Upon departing, both vehicles headed in tandem towards Interstate 295. (Id., PageID # 214 & Gov't Ex. 4B.)

---

[1] Government Exhibit 4B is a transcript of the recorded surveillance communications on 1/26/23. Government Exhibit 4A is the actual audio. For ease of reference, the Court cites to the transcript but notes that it has determined that Exhibit 4B accurately reflects the audio contained in Exhibit 4A.

Back inside the residence, Shorey provided the undercover agent with approximately 420 grams of methamphetamine. (Tr., PageID # 214 & Gov't Ex. 3.) Meanwhile, agents continued to surveil the Honda and the Dodge, which had both exited the interstate and were driving on Washington Avenue. (Tr., PageID # 223.) At approximately 12:35 AM, both vehicles were seen pulling up to gas pumps at a 7-Eleven.[2] (Gov't Ex. 4B at 844.) While at this location, one male in a mustard-colored hoodie associated with these vehicles entered the 7-Eleven. This individual also accessed the interior of both vehicles while they were parked at the gas pumps. (Gov't Ex. 4B at 846.) He then got into the Dodge Charger. At approximately 12:42 AM, both vehicles departed the 7-Eleven and headed back toward the interstate making six to seven turns on various side streets in tandem. (Tr., PageID # 228; Gov't Ex. 4B at 845.) As the vehicles traveled south on the interstate, Agent Grimes was compiling all of the surveillance. (Tr., PageID #s 231.) Based on all of the information then available, Agent Grimes determined there was sufficient probable cause to stop both the Honda and the Dodge. (Id., PageID # 232.) He communicated that determination to the entire team at 12:50 AM on January 27, 2023. (Gov't Ex. 4B at 847.) In doing so, Grimes designated the Honda as the "primary" target based on his assessment that the distribution to Shorey had taken place in the Honda. (Tr., PageID # 254 & Gov't Ex. 4 at 847.)

Based on Agent Grimes' probable cause determination, Sergeant Pappas, along with several other FBI officers, conducted a traffic stop of the Dodge.[3] (Tr., PageID # 232.) Upon stopping the vehicle, law enforcement determined that the vehicle had two occupants, the driver and a front seat passenger. The front seat passenger was identified as Defendant Angel Lozano.

---

[2] Law enforcement ultimately obtained some video footage from 7-Eleven security cameras. But, this evidence was not obtained until after the traffic stop at issue in the pending motion. (Tr., PageID # 247.)

[3] The Honda was also stopped and searched. (Tr., PageID # 232.)

(Id., PageID # 233.)  Lozano was placed under arrest.[4]  (Id., PageID # 233.)  Upon searching the Dodge in connection with this arrest, police found and seized the prerecorded $16,000 from the car's glove box, which was located in front of the passenger side where Lozano had been seated.  (Id., PageID # 233.)

## II.     DISCUSSION

Defendant now asks the Court to suppress all of the evidence and statements obtained on January 27, 2023, as a result of the stop and search of the Dodge Charger.  Under the automobile exception to the Fourth Amendment's warrant requirement, probable cause that evidence of a crime is within an automobile justifies a warrantless search of that vehicle.  See United States v. Balser, 70 F.4th 613, 619 (1st Cir. 2023) ("[A]ll the police need to search or seize a car is 'probable cause to believe that contraband is within the particular vehicle.'") (quoting United States v. Simpkins, 978 F.3d 1, 6 (1st Cir. 2020)).  "[P]olice have probable cause when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in the particular vehicle."  Balser, 70 F.4th at 619 (cleaned up).

When a probable cause determination is based upon the observations and information of multiple officers, courts employ the "collective knowledge doctrine."  Id.  Under this doctrine, the existence of probable cause can be determined by: (1) imputing the knowledge of a directing officer to the officer who makes the seizure, which is considered "vertical" collective knowledge, and/or (2) "aggregating information" known by all of the officers, which is considered "horizontal" collective knowledge.  Id.  As the First Circuit has acknowledged, these two categories of

---

[4] The drivers of both the Honda and Charger were arrested as well.  However, both drivers were subsequently released and not charged with any federal offense.  (See Tr., PageID #s 233-34.)

collective knowledge are not "mutually exclusive." Id. at 619-20 (quoting United States v. Chavez, 534 F.3d 1338, 1345 n.12 (10th Cir. 2008)).

Here, the record evinces the use of both horizontal and vertical collective knowledge. With twenty officers surveilling this January 2023 controlled buy, Agent Grimes was able to determine that the Dodge had arrived on Sherman Street with the Honda. Officers then watched Shorey interact with the Honda twice including entering the Honda with a backpack. After that, the Dodge left in tandem with the Honda. Both vehicles then stopped at the same gas station together and one individual accessed the interiors of both vehicles. Then, both vehicles headed south together. All of these actions were notably taking place late on a Thursday night in January, a time when it is uncommon to see such coordinated travel by out-of-state visitors.

Beyond these direct observations, Agent Grimes was also able to compare what was occurring to what had happened at the earlier November 2022 controlled buy at the same location with the same seller. This earlier transaction similarly involved a vehicle with a Massachusetts connection arriving after the undercover agent had entered the residence and then an apparent car-side delivery of methamphetamine to an associate of Shorey. Considering the totality of the circumstances and all of the collective knowledge Agent Grimes had amassed by 12:50 AM on January 27, 2023, the Court is satisfied that the stop and search of the Dodge Charger was supported by probable cause.

The Government asserts that this case is analogous to United States v. Soto, 375 F.3d 1219 (10th Cir. 2004) and United States v. Slone, 636 F.3d 845 (7th Cir. 2011). (See Gov't Brief (ECF No. 73), PageID #s 291-93.) In Soto, the Tenth Circuit concluded that there was probable cause to justify the stop of a vehicle suspected of conducting counter surveillance of a controlled buy of two kilograms of cocaine. 375 F.3d at 1222-23 (finding there was much more than "simple

6

proximity" given the observed connections between the counter surveillance vehicle and the vehicle directly involved in the controlled buy). In <u>Slone</u>, the Seventh Circuit upheld a finding of probable cause to stop a vehicle that was observed closely following another vehicle known to be transporting 500 kilograms of marijuana. 636 F.3d at 849. In reaching this conclusion, the Seventh Circuit noted that "the practical probabilities involved . . . teach that the movements of the [two vehicles] were not likely the product of misfortune or happenstance." <u>Id.</u> at 850. The Court agrees that the factual record here likewise establishes that the Dodge was engaged in coordinated activity with the Honda that had apparently delivered the methamphetamine to the controlled buy on Sherman Street. In short, <u>Soto</u> and <u>Slone</u> provide persuasive precedent for finding sufficient probable cause in this case.

Moreover, the Court agrees with the Government that what factually distinguishes this case from <u>Soto</u> and <u>Slone</u> strengthens the probable cause determination made by Agent Grimes. (See Gov't Brief (ECF No. 73), PageID # 293.) Specifically, here a single individual was observed accessing the inside of both vehicles after both vehicles departed Sherman Street and that same individual was then observed leaving the 7-Eleven in the Dodge.[5] Thus, in assessing the totality of the circumstances, law enforcement collectively knew that within the Dodge was the one individual who had been observed exercising dominion and control of both vehicles after the receipt of the $16,000 of prerecorded buy currency. This observation undoubtedly bolsters the fair probability that evidence of methamphetamine distribution could be found in either the Honda or the Dodge.

---

[5] The Court acknowledges that Agent Grimes testified that "it would be speculation to conclude that anything was in fact transferred" between the vehicles. (Tr., PageID # 253.) However, even in the absence of evidence of a transfer of materials, having one individual access the interior of both vehicles supports a finding that the vehicles were engaged in coordinated activity.

7

Defendant asserts that the Court should distinguish this case from Soto and Slone because both found probable cause to justify a warrantless arrest, not a warrantless search of an automobile. (See Def. Brief (ECF No. 72), PageID # 282-83.)  However, in making this argument, Defendant fails to acknowledge that the factual record developed at the hearing establishes that Lozano was arrested, and the Dodge was "searched incident to [his] arrest." (Tr., PageID # 233.)  When the events are considered in this order, the Court sees no basis to distinguish Soto or Slone or to find that the search violated the Fourth Amendment.[6]  See, e.g., United States v. Mulkern, 49 F.4th 623, 629 (1st Cir. 2022) ("[O]fficers may . . . search the arrestee's vehicle incident to the arrest 'if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.'") (quoting Arizona v. Gant, 556 U.S. 332, 351 (2009)).

On the other hand, the Court does find that the facts presented are readily distinguishable from the facts of United States v. Valenzuela, 365 F.3d 892 (10th Cir. 2004), a case Defendant urges the Court to consider.  (Def. Brief, PageID # 284.)  In Valenzuela, the Tenth Circuit upheld a finding that there were "insufficient facts" to demonstrate tandem driving.  365 F.3d at 898. However, Valenzuela started with a "hunch" by a patrol officer that two vehicles with out-of-state plates traveling on the highway during daylight hours were engaged in tandem driving. Id. at 893-94 & 897.  By contrast, this case starts as an orchestrated controlled buy taking place in a residential neighborhood late at night.  Likewise, Valenzuela lacked any observed coordinated stops or direct contact between vehicles, as there was here.  See id. at 893-95. In short, the Court finds the foundational facts of Valenzuela readily distinguishable from the facts presented here.

---

[6] The Court alternatively finds there was probable cause to search the Dodge when it was stopped independent of the search being justified as a search incident to Lozano's arrest.

8

After a full assessment of the record, the Court concludes that the Government has established that law enforcement had the requisite probable cause at the time it stopped the Dodge Charger to both arrest Defendant Lozano and search the vehicle for evidence of distributing methamphetamine.

### III. CONCLUSION

Therefore, Defendant's Motion to Suppress (ECF No. 54) is DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 31st day of October, 2023.